**Jenny RUBIN, et al., Plaintiffs–Judgment Creditors**

v.

**THE ISLAMIC REPUBLIC OF IRAN, et al., Defendants–Judgment Debtors,**

v.

**Museum of Fine Arts and Harvard University, et al., Trustee Process Defendants.**

**No. CIV.A.06 11053 GAO.**

United States District Court, D. Massachusetts.

Sept. 30, 2006.

David J. Strachman, McIntyre, Tate, Lynch & Holt, Providence, RI, Richard J.

Grahn, Edward V. Colbert, III, Georgia J. Asimakopoulos, Looney & Grossman LLP, Boston, MA, for Plaintiffs–Judgment Creditors.

Mark C. Fleming, Timothy R. Shannon, Wilmer Cutler Pickering Hale and Dorr LLP, Robert J. Muldoon, Jr., Courtney Amber Clark, Sherin & Lodgen LLP, Boston, MA, Paul R.Q. Wolfson, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Jason M. Knott, Joshua A. Doan, William D. Iverson, Covington & Burling LLP, Washington, DC, for Trustee Process Defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

### I. Introduction

The plaintiffs herein are the survivors of a terrorist attack orchestrated by Hamas. In an attempt to recover damages for the harm they suffered, they sued various defendants, including the Islamic Republic of Iran ("Iran") in a sister District Court. The complaint alleged that Iran was liable for the attack because it had provided material support to Hamas. Iran did not appear in the proceedings, and the court entered a default against it. Approximately six months later, the court entered final judgment in favor of the plaintiffs, awarding them a collective total of $71.5 million in compensatory damages and an additional $37.5 million each in punitive damages.

The plaintiffs thereafter registered their judgment with this Court and moved for an Order of Attachment by Trustee Process (Dkt. No. 2) against the Museum of Fine Arts, Harvard University and several of its museums (the "trustee process defendants"). The plaintiffs alleged, "upon

information and belief," that the trustee process defendants possess property belonging to Iran that is available to be taken by them in partial satisfaction of the judgment. This Court issued trustee process summonses in April 2005 which were served upon the trustee process defendants.

The trustee process defendants moved to quash the summonses and to dissolve the trustee process attachments (Dkt.Nos.15, 38), asserting that they do not hold any antiquities that are the property of Iran. Furthermore, they asserted that even if they did hold any such property, it would be immune from attachment under the Foreign Sovereign Immunities Act, ("FSIA" or "the Act"), 28 U.S.C. §§ 1609, 1610. Rather than responding directly to the motions to quash,[1] the plaintiffs filed a motion for partial summary judgment (Dkt. No. 31), arguing that the trustee process defendants did not have standing to assert the immunity of Iran's property from attachment under 28 U.S.C. § 1609. Concurrently with their motion for partial summary judgment, the plaintiffs filed a motion to stay the trustee process defendants' motions to quash (Dkt. Nos. 28 & 40), arguing that it would be moot if the plaintiffs were to prevail on summary judgment. The trustee process defendants opposed the plaintiffs' motion for partial summary judgment, contending that the immunity of the property from attachment under 28 U.S.C. § 1609 was an issue that could be raised properly by them or even by the Court *sua sponte*.

### II. Analysis

This Court acquired jurisdiction over the present controversy when the plaintiffs

---

1. The plaintiffs later did file an opposition to the motion to quash (Dkt. No. 51), arguing that the property in the trustee process defendants' possession falls within the commercial use exception to FSIA, *see* § 1610(a) and that,

FSIA notwithstanding, the property is subject to attachment and execution under § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub.L. No. 107–291, 116 Stat. 2322.

registered here the judgment they had obtained against Iran in the United States District Court for the District of Columbia, Civil Action No. 01–1655–RMU. *See* 28 U.S.C. § 1963; *see also U.S.I. Properties Corp. v. M.D. Constr. Co.*, 230 F.3d 489, 496–98 (1st Cir.2000) (discussing ancillary enforcement jurisdiction and stating, "[w]here a postjudgment proceeding presents an attempt simply to collect a judgment duly rendered by a federal court, even if chasing after the assets of the judgment debtor now in the hands of a third party, the residual jurisdiction stemming from the court's authority to render that judgment is sufficient to provide for federal jurisdiction over the postjudgment claim.").

The plaintiffs seek to satisfy their judgment against Iran by attaching antiquities in the possession of the trustee process defendants pursuant to Fed.R.Civ.P. 69. Rule 69 provides that supplemental proceedings in aid of a judgment "shall be in accordance with the practice and procedure of the state in which the district court

is held, … except that any statute of the United States governs to the extent that it is applicable." Fed.R.Civ.P. 69(a). The Foreign Sovereign Immunities Act, codified at 28 U.S.C. § 1602 *et seq.*, is just such a statute. Like a number of the statutes referenced in the lengthy, non-exhaustive list contained in the Advisory Committee Notes to Fed.R.Civ.P. 69,[2] FSIA "governs" attachment and execution proceedings by exempting or immunizing certain types of property. *See* 28 U.S.C. § 1609. Specifically, § 1609 provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter."

 Rule 69 therefore requires that the Court consider a particular property's immunity status under FSIA (and similar statutes) prior to allowing a judgment creditor to execute against it. This inquiry may be undertaken by the Court, *sua sponte*, or the issue may be raised by any of the parties to the dispute.[3] Neither of

---

**2.** *See, e.g.*, 5 U.S.C. § 8346(a) ("The money mentioned by this subchapter is not assignable, either in law or equity, except under the provisions of subsections (h) and (j) of section 8345 of this title, or subject to execution, levy, attachment, garnishment, or other legal process, except as otherwise may be provided by Federal laws."); 5 U.S.C. § 8470(a) ("An amount payable under subchapter II, IV, or V of this chapter is not assignable, either in law or equity, except under the provisions of section 8465 or 8467, or subject to execution, levy, attachment, garnishment or other legal process, except as otherwise may be provided by Federal laws."); 22 U.S.C. 4060(c) ("None of the moneys mentioned in this part shall be assignable either in law or equity, except under subsection (a) or (b) of this section, or subject to execution, levy, attachment, garnishment, or other legal process, except as otherwise may be provided by Federal law."); 33 U.S.C. § 916 ("No assignment, release, or commutation of compensation or benefits due or payable under this chapter, except as provided by this chapter, shall be valid, and such

compensation and benefits shall be exempt from all claims of creditors and from levy, execution, and attachment or other remedy for recovery or collection of a debt, which exemption may not be waived.").

**3.** The vast majority of the parties' briefing on the motion for partial summary judgment focused on whether § 1609 should be characterized as an affirmative defense or as an issue of subject matter jurisdiction. Both sides cite the Supreme Court's decision in *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) to support their respective arguments. To the extent that the trustee process defendants rely on *Verlinden* to argue that § 1609 is best construed as raising a threshold question of subject matter jurisdiction, it is largely irrelevant here, where the Court plainly has jurisdiction pursuant to 28 U.S.C. § 1963. Furthermore, the Supreme Court's discussion of subject matter jurisdiction in *Verlinden* was centered on 28 U.S.C. §§ 1330 and 1604;

the sources of authority Rule 69 invokes—state law or "govern[ing]" federal statutes—appear to prevent such an approach. Under Massachusetts law, there is no procedural bar to third party trustees directing the court's attention to reasons why property in their possession is immune or exempt from execution. *See, e.g., Toomey v. Toomey,* No. 1085, 1997 WL 672062, at *1–2 (Mass.App.Div. Oct.24, 1997) (on appeal of trustee's motion for dissolution of attachment, court holds that attachment preempted by ERISA); *see also* Mass. Prac. Series § 5:82 (3d ed.) (citing *Toomey* for the proposition that "A party may move for the dissolution of an attachment by trustee process on the ground that the property attached was exempt from attachment."). *Cf.* Mass. Gen. Laws ch. 223, § 42 (authorizing attachment of "[a]ll real and personal property liable to be taken on execution, except such personal property as, from its nature or situation, has been considered as exempt according to the principles of the common law as adopted and practiced in the commonwealth, or which is specifically exempt from execution [pursuant to specified statutes]," and not specifying (or limiting) which parties may raise the exemption issue). Likewise, there is no suggestion in the plain language of § 1609 that raising the question of a property's immunity from execution is a right reserved to the foreign sovereign itself. *See* 28 U.S.C. § 1609; *see also Walker Int'l Holdings Ltd. v. Republic of Congo,* 395 F.3d 229, 233 (5th Cir.2004) (stating the court had been unable to find any authority for the proposition that "it is the sovereign's *exclusive* right to raise the issue of sovereign immunity under FSIA") (emphasis in original), *cert. denied,* 544 U.S. 975, 125 S.Ct. 1841, 161 L.Ed.2d 726 (2005).[4]

neither § 1609 nor execution immunity more generally were addressed.

The plaintiffs' *Verlinden*-based argument that § 1609 is an affirmative defense which can be raised only by Iran fares no better. The plaintiffs place significant weight on a single footnote from the opinion, which reads:

> The House Report on the Act states that 'sovereign immunity is an affirmative defense that must be specially pleaded,' H.R.Rep. No. 94–1487, at 17. Under the Act, however, subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, 28 U.S.C. § 1330(a). Accordingly, *even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.*

*Verlinden,* 461 U.S. at 494 n. 20, 103 S.Ct. 1962.

There are several problems with this approach. First, as noted above, the Court's analysis in *Verlinden* was centered on questions of a foreign sovereign's immunity from suit under § 1604, not the immunity from execution of property of the sovereign under § 1609. Second, there is no reason to conclude that the Court's comment in footnote 20 is anything more than passing dictum. After all, the Court in *Verlinden* did not treat the issue as one to be raised only by affirmative defense, but, in the context of the case before it, ruled that it was the obligation of the federal courts to consider the question whether asserted as a defense or not. Finally, even if the footnote in *Verlinden* regarding § 1604 immunity could be interpreted as meaning that § 1609 immunity may (or even must, although that stretches the brief allusion too far) be raised by affirmative defense, it would not necessarily "govern" execution proceedings under Fed.R.Civ.P. 69. Rule 69 primarily directs the courts to apply state law procedures for execution and attachment, with the proviso that federal *statutes* govern to the extent they are applicable. Here, there appears to be neither Massachusetts statutory or common law nor a federal *statute* requiring possible immunity under § 1609 to be treated as an affirmative defense that can be raised only by the foreign sovereign, as opposed to the trustee custodian of the attached property.

4. My conclusion is not altered by the plaintiffs' citation of numerous cases which they claim support the notion that immunity from attachment is an affirmative defense, and

Having concluded that it is appropriate for the Court, of its own accord or at the behest of the trustee process defendants, to determine whether the property in dispute is immune from execution, I begin my analysis with a review of the relevant provisions of FSIA. The Foreign Sovereign Immunities Act defines the parameters of a foreign state's immunity in the courts of the United States. Sections 1604 and 1605 establish a foreign state's jurisdictional immunity and exceptions to that immunity. Two other sections, 28 U.S.C. §§ 1609 and 1610, address the immunity from attachment granted to a foreign state's property and enumerate exceptions to that immunity. Specifically, § 1609 provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609.

■ The property within the possession of the trustee process defendants is thus immune from execution and attachment unless one of the exceptions in §§ 1610 and 1611 applies. *See DeLetelier v. Republic of Chile,* 748 F.2d 790, 793 (2d

Cir.1984). Only one of those exceptions— that which is set forth in § 1610(a)(7)—is potentially relevant in this case. Section 1610(a)(7) provides:

> The property in the United States of a foreign state ... *used for a commercial activity* in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States ... if
>
> . . . . .
>
> the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.

28 U.S.C. § 1610(a)(7) (emphasis added).

The parties dispute the scope of this "commercial use" exception. The plaintiffs contend that it encompasses the commercial use of the property by any party, not just the foreign sovereign.[5] In contrast, the trustee process defendants argue that

therefore personal to the foreign sovereign. Most of those cases relate to a foreign sovereign's immunity from suit, *see, e.g., Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.,* 179 F.3d 1279, 1290 (11th Cir.1999) (considering Ecuadorian government's potential immunity from suit and stating that "the only exception to the FSIA that is relevant ... is waiver of immunity under section 1605(a)(1)"), an issue which FSIA treats separately. *See* 28 U.S.C. §§ 1604, 1605.

5. The plaintiffs base their argument on a comparative reading of §§ 1610(a)(7) and 1605(a)(2). Section 1610 states merely that the foreign property be "used for a commercial activity in the United States," whereas § 1605 refers to "commercial activity carried on in the United States by the foreign state." Given the history and purpose of the FSIA, *see* discussion, *supra,* this appears to be a distinction without a difference.

Similarly, the plaintiff's reliance on *Sesostris v. Transportes Navales, S.A.,* 727 F.Supp. 737 (D.Mass.1989) is not persuasive. In *Sesostris,* a bank which held a mortgage on an arrested ship claimed to be a wholly-owned subsidiary of the Spanish government and argued that its property, the ship, should be immune from attachment under FSIA. *See id.* at 743–44. The court dismissed the bank's claim, holding that it had not "adequately supported" its motion asserting foreign sovereign immunity. *Id.* at 744. The closest the court came to squarely addressing the issue of immunity under § 1610 was to state that "even if [the bank] demonstrated its ownership of the [ship] and its status as an agency of a foreign state, the property at issue in this case appears to fall within one of the statutory exceptions to immunity." *Id.* This observation appears to have been made without analysis of FSIA's history or purpose, or application of principles of international law.

the exception applies only where the foreign sovereign itself has made commercial use of the property within the United States. This is the better view. First and foremost, the plain language of FSIA, read in its entirety, warrants such a conclusion. Even if the Court were inclined (which it is not) to find § 1610's statement that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune . . . from execution" ambiguous on the question, that ambiguity would be resolved easily by reference to § 1602, which sets forth Congress' findings and declaration of purpose for the Act. Section 1602 states, in relevant part: "Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. § 1602. The clear import of this language is that foreign states risk losing their sovereign immunity where they themselves engage in commercial activities beyond their borders.

Several thorough and well-reasoned cases discuss additional factors which support the conclusion that the commercial use exception pertains only to the actions of the foreign sovereign. See Connecticut Bank of Commerce v. Republic of Congo, 309 F.3d 240, 251–60 (5th Cir.2002), DeLetelier, 748 F.2d at 795–98; Flatow v. Islamic Republic of Iran, 76 F.Supp.2d 16, 21–24 (D.D.C.1999). In Connecticut Bank, for example, the court traced the evolution of restrictive immunity, a theory under which foreign states are granted immunity for their sovereign, public acts, but not for their commercial activities. See Connecticut Bank, 309 F.3d at 252. "Moreover," the court noted, "at the time the FSIA was passed, the international community

viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action." Id. at 255–56. The DeLetelier court engaged in a similar analysis of international law before concluding that FSIA's exceptions for executional immunity were narrower than its exceptions for jurisdictional immunity. See DeLetelier, 748 F.2d at 798–99. It is further evident from the legislative history of FSIA that these well-established principles of international law informed Congress' decisions regarding the proper scope of immunity to be granted to a foreign sovereign's property. See H.R.Rep. No. 94–1487, at 27 (1976) (stating that FSIA was intended to codify the restrictive theory of immunity and partially lower the barrier of immunity from execution by making it "conform more closely with the provisions on jurisdictional immunity in the bill").

■ Taken together, the plain language of the statute, its legislative history, and generally accepted principles of international law establish that the "commercial use" exception of § 1610 applies only where it is the foreign sovereign who engages in the commercial activity. Here, it is the trustee process defendants, not Iran, who possess and make use (commercially or otherwise, an issue that need not be decided here) of the disputed antiquities. For this reason, § 1610(a)(7) is inapplicable, and the property remains immune under FSIA.

The property's immunity under FSIA notwithstanding, the plaintiffs may still be able to obtain the antiquities pursuant to § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub.L. No. 107–297, 116 Stat. 2322 (Nov. 26, 2002). Section 201 of the TRIA provides:

Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), 116 Stat. at 2337.[6]

In this case, the plaintiffs obtained their judgment on a claim for which Iran was not immune under 28 U.S.C. § 1605(a)(7). *See Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 269–70 (D.D.C. 2003). Furthermore, Iran has been designated as a state sponsor of terrorism, and is therefore a "terrorist party" as defined in § 201(d)(4) of the TRIA. *See id.* The trustee process defendants do not quibble with either of these conclusions; rather, they contend that the antiquities in their possession do not qualify as "blocked assets."

Section 201(d)(2) of TRIA defines "blocked assets" to include "any asset seized or frozen by the United States under ... sections 202 and 203 of the International Emergency Economic Powers Act" ("IEEPA"). All Iranian assets in the United States were frozen in 1979 upon issuance of Exec. Order No. 12,170. *See Hegna v. Islamic Republic of Iran,* 376 F.3d 485, 488 n. 8, 493 n. 32 (5th Cir.2004) ("In....1979 ... [t]he President froze all

property and assets of the government of Iran that fell within or would fall within the jurisdiction of the United States. Exec. Order No. 12,170, 44 Fed.Reg. 65729 (Nov. 14, 1979).... The President froze Iranian property pursuant to the International Emergency Economic Powers Act."). Exec. Order No. 12,170 has remained in effect since that time. *See, e.g.,* Presidential Notice of November 9, 2004, 65513, "Continuation of National Emergency With Respect to Iran," 69 FR No. 218 (2004).

The trustee process defendants argue that even if the antiquities in their possession were blocked originally by Exec. Order No. 12,170, they were unblocked in 1981 by action of Exec. Order No. 12,281, which was issued as part of the Algiers Accords. *See* Exec. Order No. 12,281, 46 Fed.Reg. 7923 (Jan. 19, 1981). This argument fails upon more exacting scrutiny. According to the regulations which implement it, Exec. Order No. 12,281 unblocked only those properties which are "uncontested and non-contingent ... property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities." 31 C.F.R. § 535.333(a) (defining the term "properties" as used in 31 C.F.R. § 535.215(a)). The regulations go on to specify when a property would be considered "contested" and therefore outside the scope of Exec. Order No. 12,281: "[P]roperty interests of the Government of Iran ... may be considered contested only if the holder thereof reasonably believes that Iran does not have title or has only partial title to the asset." 31 C.F.R. § 535.333(c).

■ From the commencement of this action, the trustee process defendants have repeatedly and emphatically argued that

---

**6.** The exception in subsection (b) relates to diplomatic or consular property and is inap-

plicable in this case.

none of the antiquities in their possession belong to the Republic of Iran. *See, e.g.,* Answer of Trustee Museum of Fine Arts at 2, *Rubin v. Islamic Republic of Iran,* No. 06–11053 (filed June 3, 2005) ("MFA has no goods, effects or credits of the Islamic Republic of Iran or any other Judgment Debtor in its possession."). Because ownership of the property is contested, the antiquities fall outside the scope of Exec. Order No. 12,281 and remain blocked under Exec. Order No. 12,170. Thus, if the plaintiffs are able to establish that the antiquities are indeed the property of Iran, those assets will be subject to attachment and execution pursuant to § 201 of TRIA.[7]

Accordingly, I rule as follows on the various pending motions:

For the reasons discussed herein, the plaintiffs' motion for partial summary judgment (Dkt No. 31) is DENIED, and their motions to stay briefing and decision on the motions to quash (Dkt. Nos. 28 and 40) are MOOT.

To the extent that the trustee process defendants request that the Court quash the plaintiffs' summonses and motion for an order of attachment by trustee process on the ground that any antiquities in their possession that may be the property of Iran are immune from execution under FSIA, their motions (Dkt. Nos. 15 and 38) are DENIED.

The other reason the trustee process defendants say the summonses should be quashed is that the property in question does not belong to Iran. They have included this reason in their answers to the trustee summonses. This is a disputed question of fact that remains to be resolved. The parties therefore are ordered to appear before the Court on October 31, 2006 at 2:00 p.m. to schedule further proceedings in this matter.

It is SO ORDERED.

---

7. The trustee process defendants contend that if the plaintiffs are able to establish that the antiquities are the property of Iran, their ownership will no longer be contested. The upshot of this, they argue, is that the property will no longer be blocked, TRIA § 201 would not apply, and the assets would be immune under 28 U.S.C. § 1609. Beyond the circularity of its logic, to accept this argument would effectively be to negate entirely the remedy TRIA § 201 was enacted to make available to judgment creditors of terrorist parties, such as the plaintiffs.